526 So.2d 922 (1988)
GEODATA SERVICES, INC., Appellant/Cross-Appellee,
v.
W.R. GRACE AND COMPANY, Appellee/Cross-Appellant.
No. 87-296.
District Court of Appeal of Florida, Second District.
May 11, 1988.
*923 Maxwell G. Battle, Jr., Tampa, for appellant/cross-appellee.
Julian Clarkson of Holland & Knight, Tallahassee, for appellee/cross-appellant.
SCHOONOVER, Judge.
Geodata Services, Inc. (Geodata) appeals an order striking the $300,000 in punitive damages which the jury had awarded to Geodata from W.R. Grace and Company (Grace). We find no merit in any of Geodata's contentions on this issue and, therefore, affirm that order.
Grace cross-appeals that part of the final judgment in which it was found liable to Geodata for compensatory damages. In Geodata's suit against Grace, Geodata advanced in separate counts four different theories of recovery: (1) breach of contract, (2) quantum meruit, (3) independent tort beyond mere breach of contract fraud, and (4) promissory estoppel. Although we find the evidence was insufficient to support a finding of liability based on the theory of quantum meruit or an independent tort beyond breach of contract, we find the evidence was sufficient to support an award of compensatory damages based either on breach of contract or promissory estoppel. We, accordingly, affirm the final judgment as modified by the trial court's order striking the award of punitive damages.
Grace is engaged in the business of mining and processing phosphate. The record reflects that after entertaining bids from a number of drillers Grace entered into a written contract with Geodata on October 14, 1980, in which Geodata agreed to drill approximately 1300 prospect holes on Grace's land located in northeast Manatee County, Florida. Geodata based its breach of contract count on Grace's alleged failure to negotiate in good faith a request Geodata made for additional compensation for a change in the scope of the work covered by this contract as well as on Grace's termination of the contract. While we agree with the dissent that under the terms of the contract Grace was not required to proceed with the work at the requested additional price if the price was unacceptable to Grace, we find that article III of the contract did require Grace to negotiate with Geodata in "good faith" regarding the requested increase and "to exercise their best efforts to reach a mutual agreement" on this matter. Although article *924 XI of the contract provided that Grace could terminate the contract at any time upon written notice to Geodata, we believe that the evidence was sufficient for the jury to have determined that prior to Grace's attempting to terminate the contract under the provisions of article XI by providing written notice of its intention to terminate, Grace breached article III of the contract by failing or refusing to negotiate with Geodata regarding Geodata's request for additional compensation. See Sound City, Inc. v. Kessler, 316 So.2d 315 (Fla. 1st DCA 1975). See also, Rector v. Larson's Marine, Inc., 479 So.2d 783 (Fla. 2d DCA 1985), review dismissed, 486 So.2d 596 (Fla. 1986).
The phrase "scope of the work" is not defined in the contract. However, article I of the contract entitled "SCOPE OF WORK" contained specifications regarding various aspects of the drilling anticipated by the contract and provided, among other things, that "[h]ole spacing will be approximately 660 feet." The contract provided in article II that the cost in areas accessible to rubber tired equipment would be $3.40/feet whereas in areas accessible to all terrain vehicles the cost would be $7.00/feet. The pertinent part of article III of the contract, entitled "CHANGES IN SCOPE OF WORK," provides as follows:
Owner may increase or decrease the scope of the Work by the addition or elimination of one or more items. The Contractor will submit to Owner within 15 days after receipt of a request for an addition or change to the Work, a detailed statement of the additional costs resulting from such request, together with a statement of any proposed additional fee, if any, representing Contractor's charges for each addition or change requested. No additional fee will be payable in respect of any reduction in the Scope of the Work nor in connection with additions to the Work which do not increase the Scope of the Work. Owner, will, within 15 days after receipt from Contractor of the statements referred to above, notify Contractor in writing of exceptions, if any, to such statements and Owner and Contractor agree to negotiate in good faith and to exercise their best efforts to reach a mutual agreement promptly as to the estimated additional costs and, where applicable, additional fee.
The written contract was amended at least nine times before it was terminated in June 1982. Geodata had requested and received additional compensation for each of these nine amendments. Several of the amendments were for additional holes to be drilled on various properties on which Grace had options. At least one of the amendments, however, changed the drilling pattern of the area covered by the original contract from four holes per forty acres to two holes per forty acres. For this reduction in the number of holes to be drilled, Geodata's president, James E. Bromwell, requested that the price be increased by one dollar per foot. He justified his request based on the increased distance between holes, the time required to travel between holes, and the distance which may be required to obtain water. Similarly, the tenth amendment to the contract, which is the subject of this controversy, had changed the drilling pattern further by reducing the holes to be drilled from two holes per forty acres to one hole per forty acres. Mr. Bromwell requested additional compensation in a letter dated May 25, 1982, and stated therein that this reduction in the number of holes to be drilled had eliminated some of the 150 feet holes but none of the 200 feet holes. He went on to explain how having a larger percentage of deeper holes to drill increased the difficulty and costs of drilling. Mr. Bromwell also testified at trial that reducing the number of holes drilled increased the costs; therefore, the jury had ample evidence from which to conclude that a reduction in the number of holes to be drilled did not necessarily equate with a "reduction in the scope of the work" for which article III provided no additional compensation would be due.
Furthermore, there is no indication that Grace denied Geodata's request for additional compensation and terminated the contract because Geodata was requesting additional compensation for a reduction in *925 the scope of the work. In fact, the record contains a memo dated May 27, 1982, from John T. Brooks, employed by Grace in senior management, to Albert Vondrasek, Grace's manager of phosphate development and expansion, in which Mr. Brooks stated: "The only change from the present drilling cost being requested is an extra $3.60 per foot (total $8.00 per foot) for all drilling beyond 150 feet per hole. This now occurs on 25% of the total holes drilled as opposed to the previous 12.5%. I believe this is a reasonable request." Nor does Mr. Vondrasek's memorandum in response dated June 3, 1982, contain any indication that Geodata was requesting additional compensation for a reduction in the scope of the work. Rather, Mr. Vondrasek stated in the memorandum:
Jim Bromwell's request for additional compensation on all holes from 150 ft. to 200 ft. is denied.
I suggest, since we have changed the scope of the original contract considerably, that we rebid the remaining drilling and see how competitive GeoData (sic) really is. I think this is a fair and equitable approach to a request like this, and undoubtedly, there are some hungry drillers out there that may want the job.
The record further indicates that when Mr. Brooks called Mr. Bromwell on June 7, 1982, and advised him of Mr. Vondrasek's response, Mr. Bromwell stated that Geodata would continue drilling under the present price schedule. Mr. Bromwell also testified that he arranged a meeting with Mr. Vondrasek to try to more fully explain the circumstances behind his request for additional compensation. At the meeting, Mr. Bromwell advised Mr. Vondrasek that he needed more money in order to continue operating under the contract. Mr. Vondrasek responded by stating, "[W]e are just ... going to have to do away with our drilling if that is the way you feel about it."
At trial Grace contended that the contract was terminated because of general bad economic conditions throughout the phosphate industry rather than because of Geodata's request for a price increase. Based on the evidence adduced at trial, however, the jury could have reasonably determined that Grace took advantage of the economic conditions and summarily terminated Geodata's contract rather than making any real attempt to negotiate with Geodata or using their best efforts, as required by article III of the contract, to reach a mutual agreement with Geodata regarding the increased costs and fees. Since the evidence was sufficient to support a finding that Grace breached the provisions of article III of the contract, see Helman v. Seaboard Coastline R.R., 349 So.2d 1187 (Fla. 1977), the jury's award of compensatory damages is affirmed based on the breach of contract theory of recovery.
The jury's award of compensatory damages can also be sustained on the basis of Geodata's count alleging a cause of action based on promissory estoppel. As the dissent suggests, the law on promissory estoppel in Florida is less than clear. We believe, however, that Florida courts have demonstrated an increasing willingness to apply the doctrine of promissory estoppel if necessary to prevent injustice in cases not involving the statute of frauds.
That willingness was most recently demonstrated in Crown Life Insurance Co. v. McBride, 517 So.2d 660 (Fla. 1987), when in response to a certified question, the supreme court held that "the form of equitable estoppel known as promissory estoppel may be utilized to create insurance coverage where to refuse to do so would sanction fraud or other injustice." The court noted that "[s]uch injustice may be found where the promisor reasonably should have expected that his affirmative representations would induce the promisee into action or forbearance substantial in nature, and where the promisee shows that such reliance thereon was to his detriment." McBride, citing Mount Sinai Hospital, Inc. v. Jordan, 290 So.2d 484 (Fla. 1974). Moreover, in McBride, the supreme court quoted from South Investment Corp. v. Norton, 57 So.2d 1 (Fla. 1952), in which the court had previously held that "ordinarily, a truthful statement as to the present intention of a party with regard to *926 his future act is not the foundation upon which an estoppel may be built," but the McBride court went on to state,
However, in Mount Sinai Hospital, Inc. v. Jordan, 290 So.2d 484 (Fla. 1974), we found promissory estoppel applicable to a charitable pledge, recognizing that although "[a] mere gratuitous promise of a future gift, lacking consideration, is simply unenforceable as a nudum pactum. When the gratuitous promise is coupled with an inducement for others to subscribe, the promise is no longer void on its face."
This indicates that after the holding in Mount Sinai Hospital, a "truthful statement as to the present intentions of a party" is no longer a bar to the application of the doctrine of promissory estoppel.
The dissent correctly points out that according to the holding in Tanenbaum v. Biscayne Osteopathic Hospital, Inc., 190 So.2d 777 (Fla. 1966), no cause of action based on promissory estoppel exists in Florida for oral employment contracts or other situations covered by the statute of frauds. However, Geodata's relationship with Grace was not an employer/employee relationship nor was it otherwise covered by the provisions of the statute of frauds. We, therefore, believe that Tanenbaum and its progeny have no application to the facts of this case.
As to the evidence adduced at trial on which the jury as factfinder could have awarded compensatory damages based on promissory estoppel, Mr. Bromwell testified that subsequent to the execution of the written contract he was told that Grace would give Geodata additional work beyond the contract if Geodata would purchase additional equipment. Relying on Grace's assurances of additional work, Mr. Bromwell secured a loan and obtained additional equipment. Mr. Bromwell further testified that Grace was aware that Geodata would be required to borrow money in order to purchase the additional equipment. He further testified that Grace continued to assure him that even though the phosphate industry as a whole was experiencing economic difficulties, Grace was unaffected by those conditions and would have drilling work available for Geodata for years to come. Relying on those continuing assurances, Geodata increasingly directed its efforts toward the drilling needs of Grace to the exclusion of other companies. In fact just a few months before Grace terminated Geodata's drilling contract, Geodata was the successful bidder for a $15,000,000 project in Lima, Peru. Upon the urging of Grace employees to turn down the contract and further assurances of continuing work, Mr. Bromwell declined to accept the Lima, Peru contract.
Grace's assurances of additional and continuing work made after the contract was signed did not merge into the original contract, and we consider the evidence as to those subsequent assurances separate and apart from any of the provisions of the contract. Based on the testimony at trial the jury could have found (1) that after the contract was signed employees of Grace assured Geodata of additional work for several years if Geodata would acquire additional equipment and manpower and that such assurances constituted affirmative representations designed to induce Geodata into action of a substantial character since Geodata would be required to obtain a sizeable loan in order to secure this equipment, (2) that Geodata reasonably relied on those assurances, its past dealings with Grace, and Grace's general business and credit history and incurred substantial debt in order to acquire the additional equipment, and (3) that even though Grace did award some additional work, Grace failed to fully comply with its assurances thereby causing Geodata to default on the loan obtained and to become insolvent thus suffering a detriment which, if Grace's assurances are not enforced, would result in an injustice. We, therefore, find that the jury's verdict in favor of Geodata could also have been based on promissory estoppel and, accordingly, find the final judgment affirmable on this basis as well as breach of contract.
Because the law in Florida is unclear as to the circumstances under which the doctrine of promissory estoppel may be applied, we certify the following question as a matter of great public importance:

*927 CAN THE DOCTRINE OF PROMISSORY ESTOPPEL BE APPLIED TO ENFORCE ORAL PROMISES WHEN NECESSARY TO PREVENT INJUSTICE IN SITUATIONS NOT COVERED BY THE STATUTE OF FRAUDS WHERE A PROMISOR MAKES AFFIRMATIVE REPRESENTATIONS WHICH HE REASONABLY SHOULD EXPECT WOULD INDUCE THE PROMISEE INTO ACTION OR FORBEARANCE OF A SUBSTANTIAL NATURE IF THE PROMISEE CAN SHOW THAT HE DID IN FACT RELY ON THE REPRESENTATIONS TO HIS DETRIMENT?
Affirmed.
DANAHY, C.J., concurs.
CAMPBELL, J., concurs in part and dissents in part.
CAMPBELL, concurring in part and dissenting in part.
I concur in affirming the trial court order that struck the jury's award of punitive damages to appellant, plaintiff below. On the cross-appeal, I must dissent from the affirmance of the award of compensatory damages to appellant/cross-appellee. Appellant's action below, which consisted of four counts, is sought to be sustained in regard to the jury's award of compensatory damages on the basis of one count for breach of contract and one count for promissory estoppel. Appellant's action arose out of a written contract between the parties.
The relevant parts of that contract provide as follows:
ARTICLE III: CHANGES IN SCOPE OF WORK
Owner may increase or decrease the scope of the Work by the addition or elimination of one or more items. The Contractor will submit to Owner within 15 days after receipt of a request for an addition or change to the Work, a detailed statement of the additional costs resulting from such request, together with a statement of any proposed additional fee, if any, representing Contractor's charges for each addition or change requested. No additional fee will be payable in respect of any reduction in the Scope of the Work nor in connection with additions to the Work which do not increase the Scope of the Work. Owner will, within 15 days after receipt from Contractor of the statements referred to above, notify Contractor in writing of exceptions, if any, to such statements and Owner and Contractor agree to negotiate in good faith and to exercise their best efforts to reach a mutual agreement promptly as to the estimated additional costs and, where applicable, additional fee.
No addition or change to the Work shall be commenced until such mutual agreement is reached. If Contractor fails to notify Owner that an additional fee will be payable in connection with an addition or change to the Work requested by Owner and incorporates such addition or change into the Work, the Owner will not be obligated to pay an additional fee in connection therewith.
... .
ARTICLE XI: TERMINATION OF CONTRACT
Owner may terminate this Contract at any time by written notice to Contractor. Any such termination shall be effective in the manner specified in such notice and shall be without prejudice to any claims which Owner may have against Contractor. Upon receipt of such notice, Contractor shall, unless directed otherwise, immediately discontinue the Work hereunder and shall thereafter perform only such services in connection with the Work as Owner may direct. Upon such termination, final settlement of all claims of Contractor arising out of this Contract shall be made as follows: Owner shall pay Contractor for all unpaid amounts accrued or incurred to the date of such termination for Work required or approved by Owner; provided, however, that if this Contract is terminated due to the fault or omission of Contractor, Owner will not be required to make any payment to Contractor nor shall the Contractor be entitled to receive any payment on *928 account of the amounts withheld by Owner pursuant to Article II hereof. Owner reserves all rights and remedies to take any action it deems appropriate to hold Contractor liable for any losses or damages to Owner resulting from termination of this Contract due to the fault or omission of Contractor.
... .
ARTICLE XV. MISCELLANEOUS
... .
Sec. 9. Entire Agreement; Amendments; Waivers; etc. This Agreement sets forth the full and complete understanding of the parties hereto and supersedes all prior agreements, representations and understandings oral or written, relating to the subject matter hereof.
No amendment, modification or supplement to this Agreement shall be binding unless it is in writing and duly executed and delivered by each of the parties hereto.
The rights of Contractor or Owner to enforce any provision of this Agreement shall not be affected by its prior failure to require performance of the same or any other provision by the other party to this Agreement; nor shall any right under this Agreement be deemed to have been waived unless the waiver be in writing and signed.
Unless otherwise expressly provided herein, no right or remedy conferred by this Agreement is intended to be exclusive of any other right or remedy, and each and every other right or remedy shall be cumulative and shall be in addition to every other right or remedy given by the Agreement or existing at law or in equity or otherwise.
No person other than Owner and Contractor shall have any rights under this Agreement.
In the event of any conflict between the terms of this Agreement and any of the Exhibits or Attachments hereto, the terms of this Agreement shall govern and determine the rights of the parties hereto.
Appellant does not contend that appellee waived any of those provisions of the contract. Appellee is engaged in the business of mining and processing phosphate. Appellant was engaged in the business of soil testing, drilling and phosphate and heavy mineral exploration. The contract between the parties called for appellant to drill phosphate "prospecting" holes in Manatee County on lands that appellee owned or had under option.
During the course of the performance of the contract, there were amendments to the contract that added additional properties to be drilled and also changed the drilling patterns on the property being explored or prospected. There was no evidence presented that appellee had not paid for all work performed by appellant. The contract called for appellant to be paid a certain price per drilling foot depending on the type of equipment appellant was required to use. That per foot linear drilling price was adjusted upward several times during the course of the contract. Because of a decrease in the number of holes appellee desired to have drilled on each parcel of land, appellant's profit margin decreased. Appellant again attempted to renegotiate upward the price per foot that appellee would pay for future drilling by appellant. In light of a tremendous downturn in the phosphate industry, appellee, rather than pay the higher price, chose to terminate the contract. Appellant argues that under the terms of the contract, appellee was required to renegotiate appellant's increased price proposal in "good faith." I cannot agree.
Article III of the contract, in my opinion, requires any good faith negotiation only in regard to increases in the "scope of the work" required by appellee. Even then, before the work is performed, I believe Article XI gave appellee the option to terminate the future work rather than proceed with the work at a price unacceptable to appellee. Therefore, I cannot agree that the evidence supports the award of compensatory damages to appellant on the basis of a breach of contract growing out of appellee's refusal to negotiate the higher price for future work.
*929 The only other basis on which appellant's award of compensatory damages is sought to be sustained is on the basis of its count alleging an action for promissory estoppel. I do not believe that there exists in Florida a cause of action for promissory estoppel that has been recognized by our supreme court or established by the legislature, especially in regard to the applicable facts of this case. In Southeastern Sales & Service Co. v. T.T. Watson, Inc., 172 So.2d 239, 241 (Fla. 2d DCA 1965), this court said:
We find no Florida case which has applied the doctrine of promissory estoppel. The Supreme Court, however, in a case which ruled the doctrine inapplicable indicated that any such application in Florida would be under the limited view.
"The authorities recognize and apply the doctrine of promissory estoppel when the promise of representation relates to the abandonment of existing rights; but, ordinarily, a truthful statement as to the present intention of a party with regard to his future act is not the foundation upon which an estoppel may be built." South Inv. Corp. v. Norton, Fla. 1952, 57 So.2d 1.
Appellant attempts to ground its promissory estoppel cause of action on representations by agents of appellee that appellee would continue to require appellant's services in regard to phosphate prospecting as contemplated by the contract for another ten to fifteen years. In relying on those statements, appellant admits it ignored the termination provision of the contract. Moreover, the evidence shows that appellee, during the course of the contract, did award additional work to appellant other than that originally specified in the contract. Appellant alleges in its complaint that representations regarding additional work were made "Pursuant to the negotiations between Plaintiff and Defendant which gave rise to the contract... ." Any such prior representations were merged into the integrated contract. Restatement (Second) of Contracts § 213 (1981); 3 Corbin on Contracts, § 578. Appellant further alleges that appellee orally assured appellant after the award of the contract that appellee "would award additional work to the Plaintiff by issuing it one or more additional contracts or modifying the contract ... by expanding its scope of work." The evidence presented by appellant shows that appellant was awarded and paid for some such additional work.
Appellant would seemingly attempt to convert its contract, terminable by its express terms at will by appellee, into a contract in perpetuity. In Tanenbaum v. Biscayne Osteopathic Hospital, Inc., 190 So.2d 777 (Fla. 1966), a case that has not been overruled or distinguished, the supreme court considered a cause of action where a doctor sought to enforce a contract of employment with a hospital where the parties had orally agreed that the doctor's employment was terminable only after five years and on ninety days written notice. The supreme court there held:
Doubtless because this is a matter of first impression and therefore involves the introduction into the law of this State a relatively novel concept, the case was sent here on a certificate under Sec. 4(2), Article V of the Constitution, F.S.A. The question that emerges for resolution by us is whether or not we will adopt by judicial action the doctrine of promissory estoppel as a sort of counteraction to the legislatively created Statute of Frauds. This we decline to do.
We agree with the conclusions of the Circuit Court and District Court of Appeal in rejecting the so-called doctrine of promissory estoppel and especially with the observation of the latter with reference to embracing it in view of the legislative prerogative of dealing with matters of this nature.
The petitioner had but to follow the provisions of the Statute of Frauds to secure his rights under the arrangement with the respondent instead of taking the position, rather tardily that they did not apply to him.
190 So.2d at 779.
In Keller v. Penovich, 262 So.2d 243, 244 (Fla. 4th DCA 1972), the court held, relying on Tanenbaum, that promissory estoppel is not controlling on oral employment contracts. But see Dorsey v. Bacon, 436 So.2d 1017 *930 (Fla. 1st DCA 1983); Baxter's Asphalt & Concrete, Inc. v. Liberty County, 406 So.2d 461 (Fla. 1st DCA 1981), rev'd on other grounds, Liberty County v. Baxter's Asphalt & Concrete, Inc., 421 So.2d 505 (Fla. 1982). See also Promissory Estoppel in Florida: Growing Recognition of Promissory Obligation, 16 Stetson Law Review 1 (1986), where in the introduction to their article, the authors state:
To date, Florida's courts have mentioned the principle of promissory estoppel in twenty-seven reported cases, a small number given the potential applicability and Florida's limited use of the doctrine. When invoked, the principle as stated in the Restatement (Second) of Contracts, section 90, holds a promisor liable for the induced and anticipated detrimental reliance of a promisee, even though the promisee neither gave nor promised to give anything in exchange for the promise. A comparison of Florida cases discussing promissory estoppel reveals inconsistent opinions and, in many instances, sketchy or nonexistent reasoning. Nonetheless, Florida's courts have begun to recognize the importance of promissory obligation in a new context, one distinguished from the traditional bargained-for contractual construct. Still, no clear and consistent theoretical basis for utilizing the promissory estoppel doctrine has been advanced. Given the uncertain status of the promissory estoppel principle in Florida, further case law can be expected concerning whether and under what circumstances a promisee can be awarded damages for breach of an altruistic or other non-bargained for promise.
(Footnotes omitted.)
While at first there might appear to be some question as to whether appellee properly preserved for review the question of the availability in Florida of a cause of action based upon promissory estoppel, I conclude the question in regard to the facts of this case has been preserved. Appellee objected to the charge on promissory estoppel that was given to the jury. In addition, appellee's requested charge that would have limited the application of any promissory estoppel cause of action to matters other than honest representations of future intentions was refused. There is no evidence that I can discern from the record that demonstrates that any false representations were made by appellee to appellant regarding future work. The only such representations were by persons who the evidence shows believed at the time of the representations that such work would be available.
The courts of this state have consistently refused to enforce unspecified "good cause" provisions, or allow a "bad faith" cause of action, in regard to a contract by its terms specifically terminable at will. Likewise, mere expectations based upon oral representations regarding future rights of parties to a contract specific in its written terms has been held to be insufficient to support a cause of action. Smith v. Piezo Technology and Professional Administrators, 427 So.2d 182 (Fla. 1983); Harbour Square Development Corp. v. Miller, 517 So.2d 773 (Fla. 2d DCA 1988); Ochab v. Morrison, Inc., d/b/a Ruby Tuesday and Keith Grubb, 517 So.2d 763 (Fla. 2d DCA 1987); Ponton v. Scarfone, 468 So.2d 1009 (Fla. 2d DCA 1985); Muller v. Stromberg-Carlson Corp., 427 So.2d 266 (Fla. 2d DCA 1983); Catania v. Eastern Airlines, Inc., 381 So.2d 265 (Fla. 3d DCA 1980). I must conclude that in the absence of a modification by our supreme court or the legislature, the authority of those cases prevents appellant's recovery of compensatory damages from appellee on the facts of this case regardless of the label attached to its cause of action.
I would affirm the order of the trial court striking punitive damages and I would reverse the awards to appellant of compensatory damages.