547 So.2d 919 (1989)
W.R. GRACE AND COMPANY, Petitioner,
v.
GEODATA SERVICES, INC., et al., Respondents.
No. 72522.
Supreme Court of Florida.
July 6, 1989.
Rehearing Denied September 15, 1989.
*920 Julian Clarkson of Holland & Knight, Tallahassee, for petitioner.
Maxwell G. Battle, Jr. of Maxwell G. Battle, Jr., P.A., Dunedin, for respondents.
OVERTON, Justice.
We have for review Geodata Services, Inc. v. W.R. Grace and Co., 526 So.2d 922 (Fla. 2d DCA 1988), in which the district court of appeal held sufficient evidence existed to support an award of $433,000 in compensatory damages to Geodata Services based on theories of breach of contract and promissory estoppel. The district court noted that Florida law is unclear as to the circumstances under which promissory estoppel may be applied and certified the following question as one of great public importance:
CAN THE DOCTRINE OF PROMISSORY ESTOPPEL BE APPLIED TO ENFORCE ORAL PROMISES WHEN NECESSARY TO PREVENT INJUSTICE IN SITUATIONS NOT COVERED BY THE STATUTE OF FRAUDS WHERE A PROMISOR MAKES AFFIRMATIVE REPRESENTATIONS WHICH HE REASONABLY SHOULD EXPECT WOULD INDUCE THE PROMISEE INTO ACTION OR FORBEARANCE OF A SUBSTANTIAL NATURE IF THE PROMISEE CAN SHOW THAT HE DID IN FACT RELY ON THE REPRESENTATIONS TO HIS DETRIMENT?
Id. at 927. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const. We answer the question in the affirmative where the promise is definite, of a substantial nature, and established by clear and convincing evidence. However, we find the evidence here was insufficient to establish a breach of contract and further find that promissory estoppel does not apply due to a failure of a showing of definiteness and of substantial inducement by clear and convincing evidence.
To properly address the issues presented, it is necessary to set forth extensive factual circumstances. The petitioner, W.R. Grace and Company [Grace], is in the business of mining and processing phosphate, while the respondent, Geodata Services, Inc. [Geodata], is in the business of drilling prospect holes for phosphate companies. In October, 1980, Grace entered into a contract with Geodata to drill approximately 1300 prospective holes in Manatee County. Article III of the contract, entitled "Changes in the Scope of the Work," expressly allowed Grace to increase or reduce the scope of the work by adding or eliminating items. It also authorized Geodata to submit a statement of additional fees and costs resulting from an increase in the scope of the work, but expressly required the parties to negotiate in good faith to agree upon any such additional payments and provided that "`[n]o addition or change to the Work shall be commenced until such mutual agreement is reached.'"[1]Id. at *921 927 (Campbell, J., concurring in part and dissenting in part).
Article XI, entitled "Termination of Contract," expressly provided that Grace, as owner, could terminate the contract at any time.[2] Article XV, entitled "Miscellaneous," contained a provision that no amendment or modification would be binding unless it was in writing, stating:
"This Agreement sets forth the full and complete understanding of the parties hereto and supersedes all prior agreements, representations and understandings oral or written, relating to the subject matter hereof.
No amendment, modification or supplement to this Agreement shall be binding unless it is in writing and duly executed and delivered by each of the parties hereto."
Id. at 928.[3]
The parties operated under this contract from October, 1980, to June 18, 1982, during which time the contract was amended nine times by written agreement between the parties, with most of the amendments increasing the scope of the work for Geodata. Critical to the issues in this cause is the testimony of Geodata's president concerning his communications with Grace on three separate occasions. He explained that shortly after the contract was signed in 1980, he had a conversation with employees of Grace about giving him additional work and that, following the conversation, he acquired a piece of equipment in order to do additional work. Of the nine modifications to the contract subsequent to this conversation, most were principally for additional work that was granted to Geodata.
Next, Geodata's president testified that, in October, 1981, he had another conversation with Grace employees in which they stated that "they thought I would be down in Manatee area probably three to five years drilling options." A third conversation occurred in April, 1982, in which he expressed the view that he was nervous because the economic situation was getting bad and he expressed his concern to Grace's employees because he had a pretty large debt reduction to make at the banks. He stated that Grace's employees told him that he didn't need to worry and was told they would have work for him for fifteen to twenty years. He also stated that, as a *922 result of his having other jobs ending and the contracts not being renewed, he "tried to get down to just operating two rigs for W.R. Grace."
The purported tenth amendment to the contract resulted in the dispute now before this Court. The amendment was proposed in a letter dated May 25, 1982. Therein, Geodata requested additional compensation for drilling holes that were deeper than 150 feet. In the request, Geodata's president stated that the reduction in the number of holes to be drilled had eliminated some of the 150-ft. holes but none of the 200-ft. holes and explained how having a larger percentage of deeper holes to drill increased the difficulty and costs of drilling. In a memo dated May 27, 1982, an employee of Grace deemed the request reasonable and recommended approval. Significantly, this was for work already completed, not future work as contemplated by article III of the contract. On June 3, 1982, the manager of Grace's Phosphate and Development Division rejected the requested change in a memorandum, stating:
Jim Bromwell's request for additional compensation on our holes from 150 feet to 200 feet is denied. I suggest since we have changed the scope of the original contract considerably, that we rebid the remaining drilling and see how competitive GeoData [sic] really is. I think this is a fair and equitable approach to a request like this, and undoubtedly, there are some hungry drillers out there that may want the job.
When advised that the request was denied, Geodata's president stated his company would continue drilling under the present price schedule. However, he also met with the manager of phosphate development and explained Geodata's need for more money in order to continue to operate under the contract. Geodata offered into evidence records showing that Geodata would have been entitled to approximately $1,500 in increased compensation had Grace honored Geodata's request for increased money for drilling the 200-ft. holes.
On June 18, 1982, Grace invoked the termination clause in the contract by written notice, stating: "Due to the current economic situation we request that you cancel the drilling of prospect holes in the mining area located in Northeast Manatee County." Grace did not rebid the work. Testimony was unrefuted that a slump had developed in the phosphate industry during the latter part of 1981 and that Grace's decision to curtail the drilling was based on economic reasons that still prevailed at the time of the trial. Geodata's president acknowledged that economic conditions in the phosphate industry became progressively worse beginning in late 1981 through the summer of 1982, and he was aware that companies other than Grace were cutting out their drilling work. No drilling of the quantity or type performed by Geodata was subsequently conducted by Grace or another contractor hired by Grace.
With regard to the damages, Geodata presented evidence that it was a successful bidder for a $15 million project in Lima, Peru, in December, 1981, but that Geodata had declined to accept the contract because of the work he was doing for Grace. Grace asserts that this testimony should not have been considered by the district court of appeal because the president of Geodata testified concerning the Lima, Peru, contract as follows:
Q Are you claiming as a damage in this matter the lost contract in Lima, Peru?
A No, sir.
After Grace terminated the contract, Geodata went out of business. At trial an expert accounting witness testified that Geodata was worth $433,000 at the time Grace terminated its contract, but this was later clarified to reflect that Geodata's assets were valued at $433,000 but that it also had liabilities in approximately the same amount. The jury awarded Geodata $433,000 in compensatory damages and $300,000 punitive damages. The trial court, in post-trial motions, set aside the award of punitive damages but denied the requested relief by Grace of the compensatory damages amount.
Geodata appealed the elimination of the punitive damage award and Grace cross-appealed *923 the award of compensatory damages. The district court affirmed the trial court's striking of the punitive damage award, rejected Grace's cross-appeal, and affirmed the trial court judgment awarding compensatory damages. The majority opinion recognized that Grace terminated the contract as a result of the bad economic conditions throughout the phosphate industry rather than because Geodata requested a price increase, but the court found a breach of contract for failure to negotiate in good faith under the provisions of article III and held that the jury's award of damages could be sustained on the theory of promissory estoppel.

Breach of Contract
We first address the compensatory damage award based on breach of contract. The district court, in affirming, stated:
[T]he jury could have reasonably determined that Grace took advantage of the economic conditions and summarily terminated Geodata's contract rather than making any real attempt to negotiate with Geodata or using their best efforts, as required by article III of the contract, to reach a mutual agreement with Geodata regarding the increased costs and fees.
Geodata Services, 526 So.2d at 925. We disagree. A reading of article III demonstrates that (1) good faith negotiation was required before the work was to be undertaken and the contract expressly stated that negotiations would be for "any proposed additional fees"; and (2) such negotiations were applicable only to increases in the scope of the work. The work upon which the compensatory damage award was based was not in the proposal stage; instead, it had already been completed. Even assuming the asserted change in work patterns and the deepening of test holes constitutes an increase in the scope of work, the record established the increased cost submitted by Geodata to Grace was, at most, $1,500. We are unable to perceive how the terms of this contract support a breach of contract action when the asserted breach is based on the failure of Grace to negotiate a higher price for future work not covered by the existing contract. The reasoning of Judge Campbell in his dissent on this issue is persuasive. He stated:
There was no evidence presented that [Grace] had not paid for all work performed by [Geodata]. The contract called for [Geodata] to be paid a certain price per drilling foot depending on the type of equipment [Geodata] was required to use. That per foot linear drilling price was adjusted upward several times during the course of the contract. Because of a decrease in the number of holes [Grace] desired to have drilled on each parcel of land, [Geodata's] profit margin decreased. [Geodata] again attempted to renegotiate upward the price per foot that [Grace] would pay for future drilling by [Geodata]. In light of a tremendous downturn in the phosphate industry, [Grace], rather than pay the higher price, chose to terminate the contract. [Geodata] argues that under the terms of the contract, [Grace] was required to renegotiate [Geodata's] increased price proposal in "good faith." I cannot agree.
Article III of the contract, in my opinion, requires any good faith negotiation only in regard to increases in the "scope of the work" required by [Grace]. Even then, before the work is performed, I believe Article XI gave [Grace] the option to terminate the future work rather than proceed with the work at a price unacceptable to [Grace]. Therefore, I cannot agree that the evidence supports the award of compensatory damages to [Geodata] on the basis of a breach of contract growing out of [Grace's] refusal to negotiate the higher price for future work.
Id. at 928. We agree with Judge Campbell and are unable to understand how the failure to negotiate an increase in price can be characterized as bad faith when all parties agree there was a substantial economic downturn in the industry and Geodata's own president had expressed deep concern about the condition of the industry and was aware of the fact that other companies had stopped drilling. It is equally curious that *924 bad faith can be argued when the contract was not rebid nor did Grace dig its own test holes in the manner and number that Geodata did under the contract. Clearly, Geodata did not adhere to the requirements of article III to seek increased costs but in this action still claims a breach of good faith by Grace under that same provision. We find no breach of contract under these facts.

Promissory Estoppel
The question which brings this cause to the Court is whether there is sufficient evidence to sustain the award of compensatory damages on the grounds of promissory estoppel. The district court found that Geodata's president was advised by Grace employees, after execution of the written contract, that they would give Geodata additional work beyond the contract if Geodata would purchase additional equipment. These reassurances of additional work, together with Geodata's rejection of a contract in Lima, Peru, represented sufficient evidence, in the district court's view, to establish promissory estoppel. The district court concluded that the subsequent assurances of additional work after the contract was executed were separate and apart from the provisions of the contract and found the contract was not controlling and held that, although Grace did award some additional work to Geodata, it failed to properly comply with the assurances its employees had given.
The basic elements of promissory estoppel are set forth in Restatement (Second) of Contracts § 90 (1979), which states:
(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
The character of the reliance protected is explained as follows:
The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.
Id. (emphasis added). This Court considered promissory estoppel in Hygema v. Markley, 137 Fla. 1, 187 So. 373 (1939), but rejected its application because the promise "was not definite but, on the contrary, was entirely indefinite as to terms and time." Id. at 19, 187 So. at 380 (emphasis added). Further, in South Investment Corp. v. Norton, 57 So.2d 1 (Fla. 1952), we said: "[O]rdinarily, a truthful statement as to the present intention of a party with regard to his future act is not the foundation upon which an estoppel may be built." Id. at 3. In Tanenbaum v. Biscayne Osteopathic Hospital, Inc., 190 So.2d 777 (Fla. 1966), we had before us an action for enforcement of a doctor's employment contract with a hospital in which the parties agreed orally that the doctor's employment was terminable only after five years and on ninety days' written notice. In that case, we refused to apply promissory estoppel and stated: "The question that emerges for resolution by us is whether or not we will adopt by judicial action the doctrine of promissory estoppel as a sort of counter action to the legislatively created Statute of Frauds. This we decline to do." Id. at 779. The district court found this case inapplicable because it concerned an employment contract.
Geodata grounds its promissory estoppel claim on asserted Grace employee representations that Geodata's services would be required for a considerable period of time without any regard whatever to the termination provision of the contract or the contractual requirement that any modifications, amendments or changes be in writing. *925 The only possible inducement occurred after the first statement, allegedly made shortly after the contract was signed, that Grace would give Geodata additional work if Geodata would procure certain equipment. Grace did in fact give Geodata more work after that statement was made and the equipment was acquired. A second statement was made in October, 1981, to Geodata's president who was told "that they thought I would be down in Manatee area probably three to five years drilling options." A third and final statement occurred in April, 1982, to Geodata's president by Grace employees that they would have work for him for fifteen to twenty years. We find no inducements, substantial or otherwise, were established in this record as a result of the second and third statements and none of the three are sufficiently definite in time or term or reasonableness to comply with promissory estoppel principles.
For promissory estoppel to be applied, the evidence must be clear and convincing. The evidence in this case fails to show any substantial inducement that would justify the application of promissory estoppel, particularly given the circumstances and who was making the statements. To so hold in this instance would wreak havoc with basic contract law. As Judge Campbell expressed in his dissent:
[M]ere expectations based upon oral representations regarding future rights of parties to a contract specific in its written terms has been held to be insufficient to support a cause of action. Smith v. Piezo Technology and Professional Administrators, 427 So.2d 182 (Fla. 1983); Harbour Square Development Corp. v. Miller, 517 So.2d 773 (Fla. 2d DCA 1988); Ochab v. Morrison, Inc., d/b/a Ruby Tuesday and Keith Grubb, 517 So.2d 763 (Fla. 2d DCA 1987); Ponton v. Scarfone, 468 So.2d 1009 (Fla. 2d DCA 1985); Muller v. Stromberg-Carlson Corp., 427 So.2d 266 (Fla. 2d DCA 1983); Catania v. Eastern Airlines, Inc., 381 So.2d 265 (Fla. 3d DCA 1980).
526 So.2d at 930. The law of written contracts, including the statute of frauds, would be substantially changed if we approved the application of promissory estoppel under the facts of this case. It would also become extremely difficult for parties to fully understand or be advised of their rights and obligations under written contracts.
Accordingly, for the reasons expressed, we quash the decision of the district court of appeal and remand this cause with directions to enter a judgment in favor of W.R. Grace and Company.
It is so ordered.
EHRLICH, C.J., and McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] In its entirety, article III reads as follows:

"Owner may increase or decrease the scope of the Work by the addition or elimination of one or more items. The Contractor will submit to Owner within 15 days after receipt of a request for an addition or change to the Work, a detailed statement of the additional costs resulting from such request, together with a statement of any proposed additional fee, if any, representing Contractor's charges for each addition or change requested. No additional fee will be payable in respect of any reduction in the Scope of the Work nor in connection with additions to the Work which do not increase the Scope of the Work. Owner will, within 15 days after receipt from Contractor of the statements referred to above, notify Contractor in writing of exceptions, if any, to such statements and Owner and Contractor agree to negotiate in good faith and to exercise their best efforts to reach a mutual agreement promptly as to the estimated additional costs and, where applicable, additional fee.
No addition or change to the Work shall be commenced until such mutual agreement is reached. If Contractor fails to notify Owner that an additional fee will be payable in connection with an addition or change to the Work requested by Owner and incorporates such addition or change into the Work, the Owner will not be obligated to pay an additional fee in connection therewith."
Geodata Services, Inc. v. W.R. Grace and Co., 526 So.2d 922, 927 (Fla. 2d DCA 1988) (Campbell, J., concurring in part and dissenting in part).
[2] That provision stated:

"Owner may terminate this Contract at any time by written notice to Contractor. Any such termination shall be effective in the manner specified in such notice and shall be without prejudice to any claims which Owner may have against Contractor. Upon receipt of such notice, Contractor shall, unless directed otherwise, immediately discontinue the Work hereunder and shall thereafter perform only such services in connection with the Work as Owner may direct. Upon such termination, final settlement of all claims of Contractor arising out of this Contract shall be made as follows: Owner shall pay Contractor for all unpaid amounts accrued or incurred to the date of such termination for Work required or approved by Owner; provided, however, that if this Contract is terminated due to the fault or omission of Contractor, Owner will not be required to make any payment to Contractor nor shall the Contractor be entitled to receive any payment on account of the amounts withheld by Owner pursuant to Article II hereof. Owner reserves all rights and remedies to take any action it deems appropriate to hold Contractor liable for any losses or damages to Owner resulting from termination of this Contract due to the fault or omission of Contractor."
Id. at 927-28.
[3] The remaining portion of section 9 of article XV reads:

"The rights of Contractor or Owner to enforce any provision of this Agreement shall not be affected by its prior failure to require performance of the same or any other provision by the other party to this Agreement; nor shall any right under this Agreement be deemed to have been waived unless the waiver be in writing and signed.
Unless otherwise expressly provided herein, no right or remedy conferred by this Agreement is intended to be exclusive of any other right or remedy, and each and every other right or remedy shall be cumulative and shall be in addition to every other right or remedy given by the Agreement or existing at law or in equity or otherwise.
No person other than Owner and Contractor shall have any rights under this Agreement.
In the event of any conflict between the terms of this Agreement and any of the Exhibits or Attachments hereto, the terms of this Agreement shall govern and determine the rights of the parties hereto."
Id. at 928.