427 So.2d 266 (1983)
Walter H. MULLER, Appellant,
v.
STROMBERG CARLSON CORPORATION, a Foreign Corporation, Guy Fiske, et al., Appellees.
No. 82-1034.
District Court of Appeal of Florida, Second District.
February 16, 1983.
*267 John J. Chamblee, Jr., and Robert H. Miles of Chamblee & Miles, Tampa, for appellant.
Earnest W. Dean, Jr. of MacFarlane, Ferguson, Allison & Kelly, Tampa, for appellees.
LEHAN, Judge.
Walter H. Muller appeals the dismissal with prejudice of two counts of his amended complaint against Stromberg Carlson Corporation and one count against Guy Fiske. Muller's suit alleged that Stromberg Carlson had breached an employment contract by not giving him the full salary increases to which he was entitled for the years 1979-1981 and by terminating him without cause in 1981. Muller's count against Fiske alleged that Fiske had tortiously interfered with the employment relationship between Muller and Stromberg Carlson.
The trial court dismissed the two counts against Stromberg Carlson for Muller's failure to allege sufficient facts to show the existence of an employment contract. The count against Fiske was dismissed on the grounds that Fiske, an Executive Vice President of Stromberg Carlson's parent company, was not a third party to the employment relationship. We affirm.
Muller was first employed by Stromberg Carlson in December, 1960. He alleges he *268 was told that he would become a "permanent" employee after a six-month probationary period and would remain employed as long as evaluations of his performance were satisfactory. According to the amended complaint, Stromberg Carlson followed a structured merit review policy, apparently known as the Merit Pay Plan, which required an employee and his supervisor to formulate yearly objectives to be carried out by the employee. The employee was evaluated annually to determine how well he had accomplished the objectives. The supervisor then made salary increase recommendations, which were subject to review and approval at various higher managerial levels in Stromberg Carlson and in Stromberg Carlson's parent company, General Dynamics Corporation, including review and approval by General Dynamics' executive vice presidents.
Muller alleges that in three fiscal years, despite satisfactory evaluations of his performance, his fulfillment of yearly objectives, advice to him from his supervisors that his performance merited certain salary increases, and recommendations by his supervisors of salary increases, he failed to receive the increases recommended. He alleges that such failures were due to nonapprovals by General Dynamics of the recommendations. Muller alleges that defendant Fiske maliciously and with willful and wanton disregard of the employment relationship caused those nonapprovals and caused Muller's termination.[1]
Muller contends that the policy of yearly reviews created a series of annual employment contracts, subject only to his satisfactory performance. Muller also contends that Stromberg Carlson's merit review policy created an obligation to give Muller specific salary increases which were not given. Muller further argues that, even if no contract existed, Stromberg Carlson breached a duty of good faith owed to him when the company dismissed him without just cause.
Attached to the amended complaint is a copy of the Stromberg Carlson merit review policy Among its provisions is a provision that not all employees will receive raises. The policy is in the form of a memorandum to supervisors. There is no specific allegation that the policy was communicated to Muller, but even if there had been such an allegation, our conclusion would not be different.
We have studied the extensive briefs of the parties. In his argument Muller implicitly concedes that the employment arrangement does not contain specific terms relating to tenure and salary increases. Nor has he alleged the existence of any document or agreement which establishes that the parties ever intended a definite term of employment or specific salary increases. Nonetheless, he feels that we should find an enforceable inference of these contract terms from the company policy.
We cannot agree. We see no justification to depart from long established principles that an employment contract requires definiteness and certainty in its terms. An employee's entitlement to a particular term of employment or to particular salary levels on the basis of criteria more subject to misunderstanding and dispute than definite terms in an employment contract is not, under the circumstances of this case, the province of a court of law. Even assuming that Muller's subjective expectations in this case were justified, to wit, that he had been a good employee and that the performance of good employees should be rewarded, that would not warrant a holding in his favor which would create a precedent of uncertainty in the law of Florida governing employment relationships. Mere expectations are insufficient to create a binding term of employment. Roy Jorgenson Associations, *269 Inc. v. Deschenes, 409 So.2d 1188 (Fla. 4th DCA 1982).
Similarly, even if we were to assume "bad motives" on the part of the employer in this case in failing to grant more substantial salary increases to, and then terminating, plaintiff, that in itself would not justify the relief requested. See Catania v. Eastern Airlines, Inc., 381 So.2d 265 (Fla. 3d DCA 1980).
The appellant directs the court's attention especially to American Agronomics Corp. v. Ross, 309 So.2d 582 (Fla. 3d DCA 1975), cert. den., 321 So.2d 558 (Fla. 1975), in which a letter sent to employee Ross confirming his employment specified several dates over the next year on which his performance would be reviewed. The letter further stated that the achievement of certain sales goals would be "the factor" in determining his continued employment. Although Ross met his sales goals, he was terminated after only four months. In his suit for breach of employment contract, Ross was awarded damages for unpaid salary. The appellate court affirmed the award, applying the rule of construction that an ambiguous contract is construed against the party who wrote the contract, i.e., the employer. The court specifically noted that at trial both Ross and the employer's vice president testified that the contract was for a term of one year.
American Agronomics is distinguishable from the instant case principally because Ross was given a document which purported to set out the terms of his employment which, while found to be possibly ambiguous, were more definite than the employment arrangement in the instant case and which were supported by oral testimony as to the specific term of employment. Muller, on the other hand, has not alleged that any specific agreement existed between him and Stromberg Carlson, only that the policy of the company should be determined to give rise to a contract.
Concededly, American Agronomics did involve a finding of an enforceable employment contract when no written contract established a specific duration of employment and the writing involved only established periodic reviews of performance relative to achievement of goals. However, the achievement of specific goals during a particular period was, according to the writing, to be the factor in determining the future continuation of employment, whereas in the instant case there were not shown to be objective criteria taking the matter out of the discretionary judgment of the employer. Also, in American Agronomics the testimony of both employee and employer showed agreement upon a specific term.
As to salary increases, not only does the employment arrangement alleged in this case fail to promise particular increases, but its terms establish that increases were to be in the judgment of the employer. For example, the policy provided that recommendations made by appellant's supervisor would be reviewed at a higher level, that there would be no increase without approval by the parent company, and that not all employees would receive increases.
The Stromberg Carlson written employment policy was shown to be a relatively extensive and sophisticated method of determining the future status of an employee and, if communicated to him, of justifying his belief that his future status in the company would be determined under detailed procedures. But, if we were to find an enforceable contract from these circumstances, we would be hard pressed to deny relief in the more common circumstances of simply hiring an employee for a probationary period after which he would be considered as a permanent employee and could expect salary increases if he did good work. If those circumstances entitled dissatisfied employees to relief, the courts would be potentially flooded with claims asking that judicial discretion be substituted for employer discretion. Certainly the relative degree of sophistication or detail of an employee incentive plan should not be the legal criterion by which to determine its status as a contract.
It may well be  and probably is  that the "balance of power" frequently *270 rests with the employer, as is argued by Mr. Muller. But mere unequal relative bargaining power of the parties in business relationships has never been a basis on which to either create or terminate contracts. These well understood concepts in our society underlie labor unionism and the establishment of union contracts with employers.
Our conclusion is further supported by substantial case law from Florida and other jurisdictions. It is settled law in Florida that an employment contract which is indefinite as to term of employment is terminable at the will of either party without cause. Roy Jorgenson Associates, Inc. v. Deschenes, supra; Catania v. Eastern Airlines, Inc., supra; Knudsen v. Green, 116 Fla. 47, 156 So. 240 (1934). Even though Muller claims he was hired as a "permanent" employee, in the absence of an agreement for a particular period of employment his term of employment must be regarded as indefinite and terminable at will. That this has been the law of Florida and of at least the majority of jurisdictions is shown by the extensive review of the subject in Russell & Axon v. Handshoe, 176 So.2d 909 (Fla. 1st DCA 1965), cert. den., 188 So.2d 317 (Fla. 1966).
Appellant argues that we should adopt the law developing in some other jurisdictions which may allow policy statements by an employer to give rise to enforceable contract rights of employees without the parties' explicit mutual agreement. See, e.g., Toussaint v. Blue Cross and Blue Shield of Michigan, 408 Mich. 579, 292 N.W.2d 880 (1980); Protecting at Will Employees Against Wrongful Discharge: A Duty to Terminate Only in Good Faith, 93 Harv.L.Rev. 1816 (1980). However, while the carefully reasoned opinion in Toussaint provides food for profound thought, Florida law does not reflect those views which appear to be based upon a perception of social or economic policy thought to be beneficial. We would have serious reservations as to the advisability of relaxing the requirements of definiteness in employment contracts considering the concomitant uncertainty which would result in employer-employee relationships. A basic function of the law is to foster certainty in business relationships, not to create uncertainty by establishing ambivalent criteria for the construction of those relationships. Toussaint converts policy to contractual obligation in the interests of providing employee job security. "Policy" may be defined as an "overall plan embracing ... general goals... ." Webster's New Collegiate Dictionary (1981). If policy, as so defined, were to govern legal relationships, the law would cease to fulfill the foregoing basic function which includes providing meaningful criteria for predictable consequences. Even the foregoing Harvard Law Review Note recognizes that the various courts which have adopted the position Muller asserts in this case "have failed to provide a coherent or complete doctrinal basis for the imposition of new obligations where the contracting parties theoretically could have, but have not, bargained for these obligations." 93 Harv.L.Rev. at 1817. Nor, as a matter of judicial practicality, are we convinced that the solutions offered by that Note, which essentially involve a case by case analysis of particular employer policies, would provide that coherence.
The employer's obligation of good faith found by this court to exist in Paddock v. Bay Concrete Industries, Inc., 154 So.2d 313 (Fla. 2d DCA 1963), does not supply applicable precedent here. In Paddock there was a written contract specifying employment for a definite term provided that the employee's performance during that term was to the satisfaction of the employer. The obligation of the employer in that case to determine in good faith whether the employee's performance was unsatisfactory was not deemed to create a contract for a specific term, as appellant asks us to do, but only to prevent termination of an otherwise definite contract.
Muller's additional point on appeal is that the trial court erred in dismissing the count against Fiske on the basis that Fiske was not a third party to the business relationship between Muller and Stromberg *271 Carlson. While our foregoing finding that there was no employment contract renders moot any claim of interference with contract, there remains the count against Fiske as it may relate to interference with a noncontractual employment relationship. Florida courts have held that a party to a contractual employment relationship cannot be liable for interference with that relationship. See, e.g., Paradise Shores Apartments v. Practical Maintenance Co., 344 So.2d 299 (Fla. 299 (Fla. 2d DCA 1977); Days v. Florida East Coast Railway Co., 165 So.2d 434 (Fla. 3d DCA 1964). We see no distinction in principle between such cases involving alleged interference with contractual and noncontractual employment relationships.
Muller claims, however, that Fiske's actions were maliciously and personally motivated and were, therefore, outside the employment relationship. This argument is similar to that in West v. Troelstrup, 367 So.2d 253 (Fla. 1st DCA 1979), in which West claimed that the executive director of his employer maliciously conspired with two other employees to create false allegations of wrongdoing by West. The executive director fired West because of the alleged wrongdoing. The appellate court found that the executive director was not a third party to the employment relationship and affirmed the dismissal of West's complaint for failure to state a cause of action for interference with that relationship. West is consistent with established Florida law.
Muller cites Berenson v. World Jai-Alai, Inc., 374 So.2d 35 (Fla. 3d DCA 1979), as finding that an officer of a corporation can be liable for tortious interference with a party's business relationship with the corporation if the officer was not acting within the scope of his functions within the corporate organization. However, regardless of what Berenson does or does not find in that regard, Muller has not claimed that Fiske's actions were outside the scope of his corporate functions, only that Fiske's motivation was malicious. An element of the tort of interference with a business relationship is the intentional and unjustified interference with the relationship by a third party. Allegations that Fiske acted willfully and with malice may satisfy the first portion of that element, but they do not transform Fiske into a third party. The count against Fiske was correctly dismissed.
AFFIRMED.
OTT, C.J., and HOBSON, J., concur.
NOTES
[1] Although not alleged in the amended complaint and unnecessary to our disposition of this case, we note the additional argument in appellant's brief that affidavits filed in conjunction with summary judgment proceedings show that for two of those years he received increases but in amounts less than those recommended by his supervisors and in the third year he received no increase. The policy of Stromberg Carlson called for increases of at least four percent if increases were granted. Stromberg Carlson claims that the increases for those two years exceeded four percent and Muller does not claim otherwise.