526 So.2d 961 (1988)
CITY OF CLEARWATER, Florida, a Municipal Corporation, Appellant,
v.
Robert J. BEKKER, Charles J. Cooper, E.J. Dowling, Raymond L. Emmons, Verling J. Gentile, David Hardman, William H. Herbert, John H. McNeilly, Wayne R. Meissner, James E. Mehr, Wayne E. Sibbert, J.E. Sims, Anthony L. Velong, James J. Weber, and Donald D. Wicker, Appellees.
No. 87-2385.
District Court of Appeal of Florida, Second District.
May 25, 1988.
*962 William E. Sizemore of Thompson, Sizemore & Gonzalez, P.A., Tampa, for appellant.
Cary R. Singletary of Singletary and Singletary, P.A., of Tampa, for appellees.
PARKER, Judge.
The City of Clearwater (city) seeks review of a final judgment declaring the city's termination of sick leave conversion benefits previously provided to the appellees as city employees was a violation of the equal protection and due process clauses of the Florida and United States Constitutions, and ordering the city to reinstate appellees' sick leave benefits. We reverse.
The city is a Florida municipal corporation, which operates under a city manager form of government. The city has numerous levels of employees of which the appellees are all either police sergeants or lieutenants included within the pay plan for executive or managerial/professional employees. Appellees are not represented by any labor organization or other entity whose purpose is to negotiate on their behalf with the city. There is no evidence in the record that the appellees or any city employee covered by the same pay plan as the appellees are employed pursuant to any written employment agreement. Nor does the record reflect that the appellees' employment with the city was to be for any definite period of time.
For many years, the city has maintained a fringe benefit package, which it offers to its employees with certain changes from time to time. Prior to any time giving rise to this dispute, the appellees were provided holidays, insurance coverage, and a sick leave benefit system. One feature of that sick leave system was that employees who remained with the city until retirement could receive up to 50 percent of their unused sick leave as terminal pay. The precise manner in which the system functioned was that an employee would provide notice to the city of a desire to retire. The city would then calculate the amount of unused sick leave time which the retiring employee was allowed to apply to terminal pay. Once the calculation was made, the employee would no longer perform services for the city, but would be maintained on the payroll and paid for the period of time represented by the days of unused sick leave that he was entitled to under the plan.
In 1985, the city manager and his staff resolved to grant some fringe benefits to the city's executive and managerial/professional employees in addition to those which *963 were in existence at the time or embodied in any of the city's union contracts. The record does not reflect any negotiation between anyone in the city manager's office or the city commission and any of the appellees regarding the city's extension of additional benefits. These additional fringe benefits were offered in the form of a "cafeteria plan." Under such a plan, each individual employee was free to select the type of benefit that individual most desired from a menu of benefits. The city manager's staff assessed the expense to the city of the various options available on the menu. The relative values of each option were assigned points by the city. Finally, the city manager designated the number of total points that would be included on the menu for the employees' selection.
The cafeteria style plan was placed into effect on May 21, 1985, through the issuance of a memorandum by the city manager to the executive and managerial/professional employees, which included the appellees. The city manager made it clear in the memorandum that the benefits included in the flexible benefit plan were in addition to all benefits currently available to the appellees and others in the affected group. The city did not in any way diminish the fringe benefits package which was in existence prior to May 21, 1985. Nor was any employee required to surrender an existing benefit in order to take advantage of the new program. Full control over the number of points available on the menu was retained in the city manager. Specifically, the memorandum provided:
The number of points authorized by the city manager each year will vary, depending upon a number of factors such as budgetary provisions, economic conditions, productivity, etc.
The sick leave conversion benefit, which forms the basis of this appeal, was one of the eight benefits made available under the new plan. This benefit was extended only to those employees who were eligible to retire from the city's employ after more than five years of service under the city's pension plan. The new sick leave program provided a cash payment to a qualified employee upon retirement which was the equivalent of 25 percent of that employee's unused sick leave time at date of retirement. Employees who left the city's employ under circumstances other than retirement would not be eligible to receive any sick leave conversion benefits. In order to avoid having an employee select alternative benefits and then select the sick leave conversion benefit on the eve of retirement, the city manager required that employees make the selection for each year of the program prior to their retirement. The city manager further expressed the city's intention that "the long term disability insurance, employee life insurance, and sick leave conversion will be continuing benefits."
All of the affected employees were furnished with a form for the selection of alternative benefits, which indicated that the employees were to choose from "among available options for calendar year 1985." Selections once made and indicated on the form could not be changed for that year. All the appellees initially selected the sick leave conversion benefit among other alternatives. Aside from the issuance of the May 21 memorandum and completion of the selection form by the appellees, there is no evidence of any negotiation, bargaining or discussion between the city manager or his staff and any of the appellees regarding the additional benefits.
Soon after the new benefits package was introduced, the city manager became aware of the exact economic impact of the sick leave conversion benefit and resolved that it was not economically feasible for the city to continue to offer that benefit.[1] On August 6, 1985, the city manager wrote to the appellees and other employees who had selected the sick leave benefit and indicated *964 that it was being withdrawn. The city manager further advised the employees in his August 6 memorandum that "you are requested to select one of the other benefits for calendar year 1985." He offered as the reason for the withdrawal of the benefit that "the perception is that its cost is excessively high."
Between the time that the sick leave benefit was first offered on May 21 and the time of its withdrawal on August 6, none of the appellees had sought to retire and thereby take advantage of the benefit. Additionally, there is no evidence that any of the appellees decided against retiring or resigning from the city in anticipation of eventually receiving the sick leave conversion benefit. In response to the city's withdrawal of the sick leave conversion benefit, some of the appellees selected and received alternative benefits, while others declined to submit a new selection form, maintaining that they had a right to the sick leave benefit.
Sometime after the issuance of the May 21 memorandum, the city's clerk of twenty years, Lucille Williams, decided to retire and expressed her desire to take advantage of the sick leave conversion benefit. Williams resigned on July 2, 1985, and left the city's active employment on August 5, 1985, prior to the city manager's withdrawal of the sick leave conversion alternative. Before she ceased working for the city, Williams was assured that she would receive the new sick leave conversion payout. After Williams retired, she was continued on the city's payroll under the previous sick leave plan. When it came to the city manager's attention that Williams had retired during a time when she was eligible for and had expressed a desire to select the new conversion benefit,[2] he approved a cash payment to her equal to 25 percent of Williams' unused sick leave which totalled approximately $7,500.
Police Captain James O'Neill also sought to retire from the city's employ on June 12, 1985, almost two months before the new sick leave benefit was withdrawn. He had selected the sick leave conversion benefit on May 22, 1985. O'Neill's last day of active employment was either May 29 or May 30, 1985. However, by application of the earlier sick leave plan which was still in existence, O'Neill was retained on the city's payroll after that time until January 31, 1986. In addition, under the new benefit conversion option, O'Neill was paid a cash amount of $9,527.78 by the city, prior to that benefit's withdrawal.
The record discloses no other city employee sought to retire during the period in which the May 21 memorandum was issued and the withdrawal of the sick leave conversion on August 6. Nor were any other employees besides Williams and O'Neill eligible for sick leave conversion during that time.
First, we examine the trial court's finding that the appellees had acquired a property right in the sick leave conversion benefit giving rise to due process protections. We cannot find any basis under contract or otherwise which would raise these benefits to the level of a property right. See Berrian v. National R.R. Passenger Corp., 429 So.2d 1381 (Fla. 2d DCA 1983) (citing Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). The May 21 memorandum issued by the city manager merely constituted a unilateral extension of additional benefits by the city to a specified class of employees, which within the purview of that offer, could conceivably be retrieved at any time. Nor does the statement of the city's intention, contained in the memorandum, that the sick leave conversion benefit be continuing constitute an "explicit mutual *965 promise necessary to create a binding contractual term." Bryant v. Shands Teaching Hospital & Clinics, Inc., 479 So.2d 165, 168 (Fla. 1st DCA 1985). There is nothing in the May 21 memorandum that would prohibit the city from withdrawing the sick leave conversion benefit at will if it became economically unfeasible for the city to continue to offer it. The record in this case discloses that the city's fringe benefit programs had been altered over the years by unilateral city action. The appellees were not represented by a union or any other entity and no negotiations took place between the parties that culminated in the city's extension of this additional sick leave benefit. There was no bargaining between the parties, but only an opportunity provided to the appellees to choose among several new available benefit options. Mere expectations by the appellees are insufficient to create a binding contract requiring the city to provide this sick leave benefit to the appellees on a continuing basis for any definite period of time. Cf. Muller v. Stromberg Carlson Corp., 427 So.2d 266 (Fla. 2d DCA 1983).
In Muller, we held that an employer's written employment policies, while creating certain expectations in its employee, did not constitute employment contracts. In that case, we recognized the potential for a flood of litigation if judicial discretion were to be substituted for employer discretion. Under the present situation, we cannot find that the appellees had acquired a legitimate claim of entitlement to this new sick leave benefit, which is required under Roth as a predicate for invoking a due process violation. Berrian.
Lastly, we address the equal protection claim asserted by the appellees and approved by the trial court's order, grounded upon the city's action in providing monetary benefits under the new sick leave plan to the two retiring employees, Williams and O'Neill. Under the federal and state equal protection clauses, "governmental acts that classify persons arbitrarily may be invalid if they result in treating similar people in a dissimilar manner." Dept. of Ins. v. Southeast Volusia Hosp. Dist., 438 So.2d 815, 821 (Fla. 1983) (quoting State v. Leicht, 402 So.2d 1153, 1155 (Fla. 1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1611, 71 L.Ed.2d 848 (1982)). However, it cannot be concluded on these facts that either O'Neill or Williams were situated in a similar position to the appellees. On the contrary, unlike Williams and O'Neill, none of the appellees sought to exercise their rights to obtain the sick leave conversion benefit by their retirement during the period when the new plan was in effect from May 21, 1985, until August 6, 1985. The different treatment afforded by the city to these two groups of employees, i.e., those retiring within the effective period of the new sick leave plan, and those continuing in the city's employ beyond the termination date of the plan, was justified in light of the distinct factual positions of the two groups and the fact that as we have previously determined, the city was under no obligation, contractual or otherwise, to continue to offer these benefits.
Based on the foregoing reasons, we reverse the final judgment of the trial court and remand for the entry of an order in favor of the city.
Reversed and remanded.
DANAHY, C.J., and HALL, J., concur.
NOTES
[1] The city was also unable to secure a feasible price for the life insurance or long term disability benefits, resulting in the withdrawal of both benefits later in 1985, with the employees being offered an alternative selection. The cafeteria style benefit program was no longer continued in effect for any employee in the years 1986 and 1987.
[2] Although Williams did not complete a selection form choosing the sick leave conversion benefit, she had informed the city of her desire to opt for the new sick leave benefit when it became available, and was under the impression that the city was completing the necessary forms. Immediately after her last work day, Williams realized she had not been afforded the new benefit and contacted the city manager by letter in an effort to obtain the payout provided for under the conversion plan. By reply letter, the city manager advised Williams that she would be eligible for the fringe benefit because she had retired before the benefit was withdrawn, and the city was aware of her intention to apply for the benefit prior to its withdrawal.