BARFIELD, Judge.
The Department of Administration appeals its hearing officer’s final order striking language from rule 22SM-3.007(5), Florida Administrative Code, as an invalid exercise of delegated legislative authority. We reverse the hearing officer’s findings that appellee Richard Herring had a vested interest in payment of annual leave credits, that the proposed rule amendment was not properly noticed, and that the economic impact statement was legally insufficient.
In 1984 appellee (an attorney) took a position with the Department of Health and Related Services (HRS) within the Senior Management System, which is governed by section 110.402 et seq., Florida Statutes, and chapter 22SM, Florida Administrative Code.
*963 The Senior Management System (SMS) was created in 1980 as a separate system of personnel administration for positions in the executive branch involving primarily policy-making and managerial duties, for the purpose of “attracting, retaining, and developing highly competent senior-level managers in order for the highly complex programs and agencies of state government to function effectively, efficiently, and productively.”[1] Its members are exempt from the Career Service System, serve at the pleasure of the agency head, and do not have the protection of chapter 120 for personnel actions, to which they are subject at the discretion of the agency head.[2]
The Department of Administration (DOA) is charged with adopting and amending rules for the SMS to implement the legislative purpose, including “a salary and benefit plan that provides appropriate incentives for the recruitment and retention of outstanding management personnel” and “other procedures relating to personnel administration.” [3] While the DOA is responsible for the administration of the SMS, its actions affecting agencies headed by a Cabinet member are subject to review by the Administration Commission, composed of the Governor and the Cabinet.[4] The DOA is required to submit an annual report on the SMS, and the system is subject to a biennial performance audit.[5]
Rule 22SM-1.09, Florida Administrative Code, which was in effect at the time appel-lee entered the SMS, provided that no overtime or compensatory leave could be earned or paid;[6] that 176 hours of annual leave and 104 hours of sick leave would be credited upon appointment and on each anniversary date;[7] that annual leave could be accrued up to 480 hours (the excess on the anniversary date converted to sick leave);[8] and that annual leave accrued in a prior state position could be retained and credited for use “or paid for on termination of Senior Management employment.”[9] Rule 22SM-1.12 provided for separation from the SMS by “any appropriate means,” including resignation, retirement, firing or “transfer to the Career Service by reinstatement appointment.” It also provided: “A Senior Management appointee shall be paid for unused annual leave upon separation, not to exceed 480 hours; all other Senior Management benefits shall cease. Payment for sick leave may be made when permitted by section 110.122, Florida Statutes.”
In February 1986, notice was published in the Florida Administrative Weekly of the proposed repeal of the existing SMS rules and adoption of new rules (22SM-3.001 — 3.-011) “to provide a more clearly defined rule structure for the Senior Management Service and to allow for 1985 statutory revisions.”[10] The economic impact statement *964 (EIS) calculated the cost of printing and distributing the new rules ($18.10 for 100 copies) and estimated that the leave benefits would benefit SMS employees, but stated that the calculation of the amount of benefit was not feasible, since it “depends upon salary and individual leave utilization patterns.”
The proposed rules provided for a cap of 1500 employees; conversion of excess annual leave to sick leave on the day before the anniversary date;[11] payment for unused sick leave upon separation from state government;[12] and payment for retained and credited annual leave from a prior position “on termination from state government” (when the employee has not been on a state payroll for 31 days following separation from SMS).[13] The Administration Commission amended proposed rule 22SM-3.007(6)(c) to provide for transfer of up to 240 hours of annual leave to Career Service, and for payment of any annual leave balance after the transfer.
In October 1986, notice was published in the Florida Administrative Weekly of proposed amendments to chapter 22SM-3, to implement the 1986 legislative amendments.[14] The noticed rules provided for “transfer of leave between services” and “accrual of 240 hours of annual leave and 120 hours of sick leave each year.”[15] The EIS estimated the cost of implementing the proposed rules at $11,628, noting that the actual cost of implementation would depend upon annual leave utilization patterns, and estimated that the leave benefits would benefit SMS employees, but stated that the calculation of the amount was not feasible, since it “depends upon salary and individual leave utilization patterns.”
The proposed rules provided criteria for designation of SMS positions[16] and increases in the amount of annual and sick leave as noticed,[17] rearranged the subsections dealing with payment for leave upon termination from state government[18] and added new subsections providing that a SMS member transferring to a state government position outside the SMS would retain prorated leave credits (with the 240 hour annual leave transfer provision for Career Service).[19]
At the November hearing on the proposed rule changes, written comments on the leave provisions were received from James Parry of the State University System, who recommended revising the language to indicate that annual leave credits would be transferred in accordance with the personnel plan of the receiving agency. The DOA eliminated the payment for annual leave in excess of 240 hours transferred to Career Service, so as to treat all employ *965 ees transferring out of the SMS to another state government position in the same manner.
Parry appeared at the cabinet aides meeting addressing the proposed rules which was held several weeks later in anticipation of the Administrative Commission meeting, and helped Don Bradley (a DOA attorney responsible for the rule amendments) to draft an amendment to 22SM-3.007(5) to clarify that upon transfer of a Senior Manager to a state position outside of SMS, unused annual leave credits “shall not be paid for and may be transferred subject to the rules governing the system into which the member is transferred.” The first five words of the added language are the focus of appellee’s rule challenge.
In early 1987, appellee was faced with a possible forced resignation as the result of a change in HRS personnel, and resigned in March to accept a position with the legislature at a reduced rate of pay. Unaware of the rule changes which had occurred since he joined the SMS in 1984, he requested payment for accrued annual leave, counting on the estimated $10,000 to ease the transition. When he discovered that his annual leave had instead been transferred to his new position, he protested to the DOA and HRS. The central personnel officer at HRS informed him by letter of the rule changes; the DOA informed him that his leave transfer had been processed properly and that HRS does not have the authority under the rule to pay for unused leave upon transfer to another position in state government.
Appellee then filed a rule challenge petition with the DOA, asserting that rule 22SM-3.007, which became effective in May 1986, and the February 1987 amendment to that rule exceeded the agency’s statutory authority “because it operates unlawfully to deprive Petitioner of a vested property right, to wit: cash value of annual leave accumulated prior to the rule’s adoption,” is “arbitrary and capricious,” and establishes penalties not authorized by the legislature “by allowing DOA and HRS (in effect) to seize Petitioner’s accumulated cash property”; that the rule was materially changed after public hearing “without such change being supported or noticed as required by law”; and that the economic impact statements of both versions of the rule were not adequate, because they did not apprise appellee and others similarly situated of the negative implications of the rule.
Appellee also filed a petition with HRS for a formal hearing under section 120.57, Florida Statutes (1985). The cases were consolidated and the rule challenge hearing was held first. The hearing officer received numerous exhibits and heard testimony from appellee, from the HRS records custodian, and from Don Bradley, who explained the goals of the amended rules, his understanding of their intended meaning, and the procedures by which they were adopted.
In his final order, the hearing officer made extensive findings of fact and concluded that the rule which became effective in May 1986 “was not the pertinent rule” when appellee sought payment for annual leave credit and could not be used by the agency in responding to his request, that this rule was neutral on the question presented (payment of leave credits upon transfer to the legislature), and that appel-lee did not have standing to challenge it.
The hearing officer concluded, however, that appellee did have standing to challenge the February 1987 amendment to the rule and that he had timely challenged the EIS. He found that the DOA “failed to adequately identify the negative implications of the rule” for persons like appellee who wish to cash in their credits instead of transferring them to another state employment, because the EIS did not mention the “loss of cash value in view of the rule’s terms which prohibit the payment for annual leave credits,” and that this procedural deficiency impaired the fairness of the rule making proceeding.
He also found that the DOA’s change in the noticed rule disallowing payment for annual leave upon transfer within state government “was not the product of information developed in the record of the pub- *966 lie hearing” or in response to written material received within 21 days of notice and made a part of the record, was not a merely technical change or a response to the proposed amendments “in the way of an objection by the APA committee” as authorized by section 120.54(13)(b), and was therefore required to be noticed as a substantive change. The lack of such notice, he concluded, rendered the change an invalid exercise of legislative authority.
The hearing officer also found that the “questioned phraseology” failed to recognize appellee’s vested rights to his annual leave credits and caused the diminution of their value, and thereby constituted arbitrariness on the part of the DOA “sufficient to cause the excision of that language from the rule.” He struck the offending five words, leaving the following version of the rule:
(5) Upon transfer of a Senior Management Service member to a position in state government outside the Senior Management Service, annual leave cred-transferred subject to the rules governing the system into which the member is transferring.
The parties do not dispute the hearing officer’s finding that appellee did not have standing to challenge the May 1986 rule replacing rule 22SM-1.09, which had provided for payment for accrued annual leave from a prior state position “on termination of Senior Management employment.” The May 1986 rule provided for payment for retained and credited annual leave from a prior state position “on termination from state government.” It also provided for transfer of up to 240 hours of annual leave to Career Service and payment of any excess leave after the transfer. Notwithstanding the somewhat confusing structure of the rule, the intent of the agency appears to have been to pay for accrued annual leave credits only upon termination from state employment, except in the case of senior managers transferring to Career Service, who would be paid upon transfer for any accrued leave over 240 hours.
The DOA challenges the hearing officer’s conclusions that the economic impact statement and notice for the February 1987 amendment to this rule were inadequate to apprise appellee of its effect on him, and that the stricken language was “arbitrary and capricious” because it divested him of his “vested interest” in the “cash value” of annual leave credits accrued prior to the effective date of the rule. The hearing officer apparently viewed the May 1986 rule as not addressing the question of payment for annual leave accrued in the SMS, but only payment for leave accrued in prior state positions, and concluded that appellee was therefore somehow entitled to payment for accrued leave (perhaps under the repealed rule) and that this entitlement was a vested interest which was cut off by the February 1987 rule amendment.
If chapter 22SM-1 (the repealed rule) authorized payment “on termination of Senior Management employment” of accrued leave however it was accrued, notwithstanding its reference to leave retained from a prior position, then logically chapter 22SM-3 (the May 1986 rule) provided for payment of that same leave only “on termination from state government” and (with the exception for transfers to Career Service) was meant to encourage senior managers to remain in the SMS instead of transferring to other state systems. In addition to providing for additional amounts of annual and sick leave, the February 1987 amendment merely clarified that intent and made it uniform (by eliminating the Career Service exception), with the additional caveat that a senior manager who transferred to another state position could transfer only as much leave as the receiving agency allowed.
Contrary to appellee’s assertions, the personnel rules in effect during his employment in the SMS did not create a vested property interest in cash payment of his accrued annual leave at a particular stage in his employment, or in a particular “cash value” attached to that leave.[20] He may be said to have a vested interest in the *967 annual leave which he has earned, but even this is subject to limits.[21]
Appellee chose not to use his annual leave, expecting to be paid for it upon transfer to the legislature, and found out that in fact he was not entitled to such payment unless he terminated state employment. The May 1986 rule effected this change, but appellee has not challenged the hearing officer’s findings that this rule was neutral on the question presented and that he did not have standing to challenge it. Even if he had been found to have standing to challenge the May 1986 rule, he has not demonstrated on this record that the rule was arbitrary, thereby depriving him of due process, or that there were any technical defects in the rule adoption procedure that would affect its validity.
The EIS for the February 1987 rule amendment correctly stated that the net effect of the rule was advantageous to SMS members (they would receive 64 additional hours of annual leave and 16 additional hours of sick leave each year), but that the exact amount of the impact depended on individual leave utilization patterns.[22] Appellee convinced the hearing officer that the EIS was inadequate because it did not spell out that for a person in his particular position (leaving the SMS before he would accrue much of the added leave credits, having already accrued the maximum leave credits, and transferring to another state position instead of terminating state employment) the rule could have what he would consider a net detrimental effect (he would keep the leave credits, but he would not be paid in cash for them until he terminated state employment, contrary to his plans).[23]
Chapter 120 does not require the agency adopting a rule to specifically identify every possible detrimental effect of a proposed rule under every conceivable set of circumstances. The EIS in this case estimated that the rule would generally benefit SMS members, and pointed out that its exact impact would depend upon individual circumstances. This economic impact statement put appellee and others like him on notice to investigate further, which ap-pellee failed to do.
The hearing officer’s conclusions regarding appellee’s vested interest in the cash value of his annual leave credits and the adequacy of the EIS and notice of the proposed rule are not supported by the record or the law. The final order is REVERSED.
THOMPSON and NIMMONS, JJ., concur.

. Chapter 80-404, Laws of Florida.

. Chapter 85-318, Laws of Florida; § 110.403, Fla.Stat. (1985).

. Chapter 80-404, Laws of Florida.

. Id.; § 14.202, Fla.Stat. (1987).

. Chapter 85-318, Laws of Florida; §§ 110.406 and 110.407, Fla.Stat. (1985).

. This is a disadvantage as compared to Career Service, in which overtime may be earned under certain conditions. Chapter 22A-8, F.A.C.

. This is an advantage over Career Service, in which annual leave and sick leave are earned at a designated rate (depending on length of service) with each pay period. Chapter 22A-8, F.A.C. A person starting out in state employment would have earned 156 hours of annual leave and 60 hours of sick leave at the end of his first year in the Career Service System; he would have been credited with 176 hours of annual leave and 104 hours of sick leave on his first day in the Senior Management System.

. This is an advantage over Career Service, whose employees are encouraged to use their annual leave, but may accrue up to 240 hours (the excess is converted to sick leave or reimbursed at half the pay rate at the end of each fiscal year). Chapter 22A-8, F.A.C.

. Career Service employees can be paid for up to 240 hours of unused annual leave at their current pay rate only upon "terminal separation from state government” after at least six months of satisfactory service. Chapter 22A-8, F.A.C.

. Chapter 85-318, Laws of Florida provided that the SMS would cover only managers "at the highest executive-management-level agency positions,” limiting their number to 1500, and created the Selected Professional Service System *964 (SPSS) to cover the lower-level managers. It also provided for personnel actions exempt from chapter 120 and at the discretion of the agency head, and the reporting requirements mentioned earlier.

. This would allow an SMS employee to accrue up to 656 hours of annual leave during the year (480 hours accrued as of the day before the anniversary date plus 176 hours credited the next day); previously, excess annual leave was converted to sick leave on the anniversary date, after the 176 hours had been credited).

. The repealed rule had provided for "terminal payment” for unused sick leave under section 110.122, Florida Statutes. The new rule added a rate of payment.

. The repealed rule had allowed payment "on termination of Senior Management employment.”

. Chapter 86-149, Laws of Florida, provided that salaries and benefits for the SMS would be set in accordance with SMS rules, limited the number of SMS employees to 500, and established a separate class in the retirement system for senior managers.

. No changes were noticed for rule 22SM-3.-004. In December 1986, notice was published of a proposed change in that rule because of comments received at the November public hearing on the other proposed rule amendments.

. Proposed rule 22SM-3.002(5).

. Proposed rule 22SM-3.007(3). A later amendment, 22SM-3.013, credited SMS members whose anniversary dates occurred prior to the effective date of this rule with prorated increases in annual and sick leave.

. Proposed rules 22SM-3.007(6) and 22SM-3.-007(7).

. Proposed rules 22SM-3.007(5) and 22SM-3.-007(8).

. See City of Clearwater v. Bekker, 526 So.2d 961 (Fla.2d DCA 1988).

. For example, if he does not use his annual leave in excess of 480 hours by the day before his anniversary date, the excess annual leave is transferred to his sick leave account.

. For example, how many people stayed in the SMS, how many transferred to other state positions, how many terminated state employment, how much annual leave was used and when it was used, etc.

.The "cash value” of these retained leave credits would, of course, depend on his salary at the time he terminated state employment, which would itself be dependent on many variables.