CONNER, J.
Florida law has long recognized that statements in employee handbooks, policy statements, or procedure manuals do not constitute the terms of a contract of employment and thus do not give rise to enforceable contract rights. However, an enforceable contract right may arise if a statement induces an employee to refrain from performing an action separate from their normal contractual duties. The unique facts alleged in this case require reversal of summary judgment in favor of the employer because material facts remain in dispute concerning the intent of the parties regarding a compensation plan: whether the intent of the plan was to merely induce employees to work hard or was to induce employees to refrain from exercising their right to terminate employment.

Procedural and Alleged Factual Background

Margaret Turton filed a complaint demanding an • accounting and alleging breach of contract based upon The Singer Employee Long Term Incentive Plan (“the Plan”). She alleged that the Plan was an offer and her acceptance of the Plan created a binding contract between her and Singer Asset Finance Company, LLC., (“Singer”) and Radian Group, Inc., (“Radian”). Her allegations of breach of contract asserted that Singer and Radian failed to pay funds due to her and refused to make an accounting. Singer responded by explaining that no contract existed; Radian filed a motion to dismiss alleging it was not a party to the contract.
Turton’s complaint alleges the facts pertinent to our decision:
7. In and prior to 2001, Singer and its owner Radian was in the business of purchasing, servicing and securitization of assets, including state lottery awards and structured settlement payments....
8. Plaintiff Margaret Turton was in the employment of and providing services for Singer and Radian from 1997 through December 2009.
9. In 2000 or 2001, Singer and Radian decided that Singer would cease all business except to become a “run down” entity, functioning solely for the collection of the then existing structure settlement portfolio.
10. To incentivize select employees to remain with their essentially dead-end *637 business, and to insure that the value of their structured settlement collections be maintained, Singer and Radian offered the 2001 Singer Long Term Compensation Plan (The Plan). The Plan is attached as Exhibit A.
11. In consideration of and in reliance on the promised benefits from The Plan, Turton accepted the offer and, under such contract with Singer and Radian, continued to provide her services to Singer and Radian from 2001 through December 2009.
14. Upon and after resigning her employment in December 2009, Turton has vested rights as a shareholder under the terms of the Plan.
15. Singer, Radian, and Weinberger[1] have failed and refused to recognize the vested rights of Turton as a shareholder of The Plan.
[[Image here]]
22. The Plan is a contract between plaintiff and defendants Singer and Radian under which money is due and owing to plaintiff since as early as September, 2009.
28. Singer and Radian breached the contract by failing to properly account for funds allocated to the plan, converting Plan funds to their own use, failing to properly account for share allocation among shareholders in the Plan and failure to pay funds currently due plaintiff under The Plan.
Attached to the complaint was a copy of the Plan. The first section of the Plan is entitled “Overview,” in which the following statements are made:
The Singer Employee Long Term Incentive Plan is designed around the value of the structured settlement portfolio owned by Singer. Today, Singer has 2 permanent financing vehicles for structured settlements. These 2 vehicles, one with Industrial Bank of Japan (IBJ) and the other with BMO Nesbit Burns/ MBIA (BMO) each have a subordinate cash flow. The concept of subordination means that Singer hopes to collect a great deal of money after IBJ and BMO have paid in full. Therefore, Singer has a very large financial stake in the collection performance in these assets. It is expected that in the next 15 years, the Singer servicing organization will collect over $83 million for Singer after IBJ and BMO have been paid in full ... This long term incentive plan has been created to share these collections with employees, depending upon the ultimate collection performance of the assets.
Two of the four expressly stated objectives of the Plan are: “Offer enough benefit to employees in order to motivate them to perform their jobs at a high level over a long period of time” and “Create enough disincentives so that employees will not resign their positions.” (emphasis added).
The Plan states its beginning date as July 2, 2001. It provides a formula for how employees will receive shares in the Plan each year and a provision for a minimum of twenty-five shares per employee per year. In a section entitled “Retaining ‘Shares’ Already Earned,” it states:
Employees who have earned ‘shares’ from prior years and whose employment has been involuntarily terminated by Singer will retain 100% of their earned shares, even after they have left Singer. Although, those employees who are terminated involuntarily, due to reasons of cause, will forfeit 100% of all ‘shares’ *638 earned. Employees who voluntarily resign their position at Singer will forfeit 50% of all ‘shares’ they have earned and will retain the remaining 50% of their earned shares.
The Plan further contains formulas for determining the value of shares, how much each shareholder receives for the shares, and how actual payments will be made to shareholders.
In its motion for summary judgment, Singer asserted the Plan is not a contract or even an offer and any compensation provided for in the document can be discontinued at any time and is purely discretionary, thus making the Plan a proposal to provide discretionary income.
In her affidavit in opposition to summary judgment, Turton states,
5. In consideration of and in reliance on the very definite and significant benefits detailed in The Plan, I accepted the offer by remaining in their employment to collect the Plan receivables for eight more years. Under such contract with Singer and Radian, I continued to provide services to Singer and Radian from 2001 through December 2009.
6. If not for the offer of significant compensation under the Plan, I would not have remained in employment with defendants beyond 2001.
7. To encourage me to stay through the years in a dead-end job, management at Singer repeatedly pointed with great pride to the very significant monies I had earned and would continue to earn under The Plan. At their urging, and for the benefit of myself and, eventually, my child, I remained and worked year after year in reliance on The Plan. The explicit agreement was that if I stayed, they would pay. I stayed.
In granting summary judgment, the trial court found that there is no explicit language in the Plan stating that it constitutes a binding contract and that the Plan was merely a unilateral expectation. In support of its conclusion, the trial court cited OneSource Facility Services v. Mosbach, 508 F.Supp.2d 1115 (M.D.Fla.2007). Subsequent to entry of the order granting summary judgment to Singer, the trial court entered a final judgment in favor of Singer and Radian. In the final judgment, the trial court included language purportedly amending the summary judgment to include Radian, even though Radian never moved for summary judgment.[2]

Legal Analysis

Turton argues before us, as she did below, that the Plan constituted a written offer and her continued employment was her acceptance of the offer. Singer and Radian argue that the Plan is merely an employer memorandum that expresses “discretionary employment compensation based on future predictions and future employment performance.” They further assert the Plan cannot be a contract because it was not signed by Turton. They also argue that even if the Plan was an offer, there was insufficient summary judgment evidence to show an acceptance or meeting of the minds necessary for the formation of a contract.
OneSource, the primary legal authority cited by Singer in its motion for summary judgment and the sole case cited by the trial court in the order granting summary judgment, affirmed a summary judgment in favor of the employer on three bases: (1) according to well-established Florida *639 law, policy statements in employee manuals do not give rise to enforceable contract rights unless there is specific language which expresses the parties’ mutual agreement that the manual constitutes a separate employment contract; (2) the provisions in the contested document gave the employer the right to amend, terminate or modify the compensation plan at any time; and (3) the plan was not signed by the employee. OneSource, 508 F.Supp.2d at 1123-24. If this case involved a similar future compensation plan based solely upon Turton performing work, we would agree the legal reasoning in OneSource is applicable to the instant facts. However, the legal reasoning in OneSource does not properly apply to the alleged facts in this case for three reasons.
OneSource is distinguishable from the facts of this case because the document at issue in OneSource contained language such as “[p]articipants will not have any vested rights to the MIC payment,” and “the Company may terminate, amend or modify the MIC payment in any respect, at any time.” Id. At 1122 No similar language is found in the Plan. Despite Singer’s arguments to the contrary, there is no language in the Plan which makes future compensation illusory because it is discretionary with the employer or plan administrator.
More importantly, the legal reasoning in OneSource, premised on the well-established Florida law that policy statements in employee manuals do not give rise to enforceable contract rights, does not fully resolve this case because the facts alleged in Turton’s complaint and affidavit in opposition to summary judgment allege the Plan was not only designed to compensate employees for hard work, but also to corn-pensóte valued employees for not quitting a dying business. There is a logical distinction between offering an employee future compensation if he or she works well and offering future compensation if the employee agrees not to quit. Nothing in the facts argued by both sides suggests that Turton’s employment was for a stated period of time. Thus, Turton’s employment was at will, and she could quit at any time without liability. See Muller v. Stromberg Carlson Corp., 427 So.2d 266, 270 (Fla. 2d DCA 1983) (“It is settled in law in Florida that an employment contract which is indefinite as to term of employment is terminable at the will of either party without cause.”). It can be inferred from the facts alleged in the complaint that Singer knew it could not collect the money it was expecting if employees started quitting once it was known only two major assets remained and no new assets would be coming in. One can also infer from the alleged facts that it was more important for Singer to keep employees from quitting than it was to motivate them to work harder.
Finally, the fact that Turton did not sign the Plan is not dispositive. She alleged the Plan constituted an offer and her continued employment was her acceptance. To the extent the Plan can be construed as a continuing promise of future compensation if Turton agreed not to quit, her continued performance of her job was acceptance, unless some reason, other than the Plan, was her primary motivation to continue working. See Bullock v. Harwick, 158 Fla. 834, 30 So.2d 539, 542 (1947) (the acceptance of an offer may be in writing, by parol, or by acts, but in whatever mode the assent must be in some overt manner, by some overt act).[3]
*640 The core issue in this case is whether the transmission of the Plan to Turton constituted a continuing offer to avoid Turton’s resignation and whether Turton’s continued employment was a continuing acceptance of the offer. Because the intent of the parties is in question, this case cannot be properly disposed of by summary judgment. As a result, we reverse the summary judgment in favor of Singer and remand the case to the trial court for further proceedings consistent with this opinion. We also reverse the summary judgment in favor of Radian because Radian never moved for summary judgment. Univ. of Miami v. Sosa, 629 So.2d 172, 174 (Fla. 3d DCA 1993) (“Although not unauthorized, it is not generally accepted practice to enter summary judgment in favor of a nonmoving party.”). Because both summary judgments are reversed, the final judgment is vacated.

Reversed and remanded.

TAYLOR and MAY, JJ., concur.

. Weinberger was the Plan administrator. Turton’s complaint contains a count solely against Weinberger for breach of fiduciary duty; however, that count is not an issue on appeal.

. Radian's motion to dismiss was never heard by the trial court prior to the entry of the final judgment in favor of both Singer and Radian.

. In her affidavit in opposition to summary judgment, Turton stated, “Singer repeatedly pointed with great pride to the very significant monies I had earned and would continue *640 to earn under The Plan,” indicating that Singer repeatedly acknowledged its offer was ongoing and recognizing her acceptance of the offer.